UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARIEL HEBERT,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPARTMENT OF DEVELOPMENTAL SERVICES, and EXECUTIVE OFFICE OF HEALTH & HUMAN SERVICES,<br><br>    Defendants. | Civil Action No. 23-11037 |

## MEMORANDUM OF DECISION

February 3, 2025

JOUN, D.J.

  This case arises out of Ariel Hebert's ("Ms. Hebert" or "Plaintiff") allegations of religious discrimination against the Massachusetts Department of Developmental Services ("DDS") and the Massachusetts Executive Office of Health and Human Services ("EOHHS") (collectively, "Defendants"). On November 3, 2021, during the COVID-19 pandemic, Ms. Hebert—a Developmental Service Worker I (also known as a Direct Care Worker) employed by DDS—was denied a religious exemption from the Commonwealth's COVID-19 vaccine requirement. On May 10, 2023, Ms. Hebert filed suit against Defendants, alleging religious discrimination under Title VII. [Doc. No. 1]. Now before me are Defendants' Motion for Summary Judgment and Plaintiff's Motions to Strike. [Doc. Nos. 21, 24-26]. For the reasons below, Plaintiff's Motions to Strike are <u>DENIED</u> and Defendants' Motion for Summary Judgment is <u>GRANTED</u>.

1

I.  **BACKGROUND**

    A.  <u>Facts</u>

During the fall of 2021, Massachusetts was in the midst of the COVID-19 pandemic. [Doc. No. 23 at ¶ 4]. COVID-19 is a contagious viral disease that can cause severe symptoms in those it infects, sometimes resulting in hospitalization and even death. [*Id.* at ¶¶ 1, 3]. By January 2021, in response to the public health emergency posed by the pandemic, the U.S. Food and Drug Administration ("FDA") had approved or authorized three COVID-19 vaccines to help reduce the spread and burden of the disease [*Id.* at ¶ 10]. The FDA reviewed extensive safety data on each of the vaccines prior to deeming them safe, and all three vaccines have also been deemed safe by the World Health Organization and other public health agencies. [*Id.*]. The vaccines have been used in billions of people globally, and the safety of the vaccines are monitored on an ongoing basis. [*Id.*].

On August 19, 2021—by which point there had been about 18,000 deaths from COVID-19 in Massachusetts alone—Governor Charles Baker issued Executive Order 595 ("EO 595"), requiring all executive department employees in Massachusetts to receive COVID-19 vaccination, demonstrate proof of such by October 17, 2021, and maintain full COVID-19 vaccination status as a condition of continued employment. [*Id.* at ¶¶ 22, 24]. EO 595 also mandated that executive agencies create a procedure to grant exemptions from the vaccination requirement for any employee unable to receive the vaccination due to a medical disability or sincerely held religious belief, so long as a reasonable accommodation could be reached. [*Id.* at ¶ 25]. EO 595 was grounded in health and safety concerns, as the Baker-Polito Administration determined that mask-wearing and testing would not provide a sufficient level of protection for employees, clients, and the public generally. [*Id.* at ¶ 32]. It was also based on operational

concerns, as the Baker-Polito Administration determined that the increased risk of COVID-19 illness in the absence of vaccination would result in operational hardships in the EOHHS providing critical health, welfare, and human services functions to the public. [*Id.* at ¶¶ 33-34, 43-46]. Many of these services are provided to populations of individuals especially vulnerable to the risks of COVID-19. [*Id.* at ¶ 30].

EOHHS and DDS diligently implemented EO 595. [*Id.* at ¶ 26]. DDS is an executive state agency tasked with providing specialized services and support programs for individuals with intellectual and developmental disabilities. [*Id.* at ¶¶ 35-36]. DDS is an agency within EOHHS, which provides human resources services and oversight for DDS and other health and human services agencies. [*Id.* at ¶¶ 28, 35]. In compliance with EO 595, the Human Resources Division for the Executive Branch ("HRD") issued a Vaccination Verification Policy for all executive agencies, including DDS. [*Id.* at ¶ 28]. Also in compliance with EO 595, EOHHS developed a procedure to allow limited exemptions for employees unable to receive a COVID-19 vaccination because of a medical condition or a sincerely held religious belief. [*Id.*].

In the fall of 2021, when EO 595 was being implemented, Ms. Hebert was employed as a Direct Care Worker in the Wrentham Developmental Center ("WDC")—a residential care facility operated by DDS which provided care for approximately 175 developmentally impaired adults at the time. [*Id.* at ¶¶ 39, 59]. Throughout the fall of 2021, DDS struggled with significant staffing shortages and service disruptions resulting from COVID-19 exposure and infections among staff and residents. [*Id.* at ¶¶ 43-47]. Ms. Hebert's responsibilities at WDC encompassed helping individuals with disabilities at the facility, assisting in such areas as habilitative, behavioral, and recreational programs; individual review meetings; personal and nutritional care; and other daily living activities such as cleaning and hygiene. [*Id.* at ¶ 60]. To perform such

duties, it was necessary for Ms. Hebert to work in-person at WDC and to be in regular contact with residents and other DDS staff, leading to high susceptibility to the transmission of COVID-19 infections. [*Id.* at ¶¶ 61-62].

On October 2, 2021, using an exemption request form, Ms. Hebert requested an exemption to EO 595 due to her religious beliefs. [*Id.* at ¶ 64]. Specifically, she stated, "I am spiritual and I believe in holistic healing. I do not attend church, I am spiritual and vegan and believe in holistic and herbal remedies." [*Id.* at ¶ 65]. Upon receiving Ms. Hebert's request, DDS's Diversity Officer contacted Ms. Hebert by telephone to engage in further discussion, during which Ms. Hebert asked that she be allowed to work exclusively from home and be tested for COVID-19 instead of receiving the vaccination. [*Id.* at ¶ 67]. After reviewing her request form, the telephone call, her work duties and location, and whether there were any accommodations that would not result in undue hardship on DDS, reviewing staff at EOHHS and DDS ultimately denied Ms. Hebert's request. [*Id.* at ¶¶ 68-72].

In reaching their decision, reviewing staff considered the in-person nature of Ms. Hebert's role and the fact that she worked in close proximity to residents and other direct care workers at WDC. [*Id.* at ¶ 69]. As such, they determined that her being nonvaccinated on the job—and her increased susceptibility and ability to spread COVID-19 that would result—would negatively impact workplace safety, direct care for residents, and other DDS logistical factors such as staffing and workflow and would thus impose undue hardship on DDS. [*Id.* at ¶¶ 69, 72-73]. They also found that no alternative accommodations were available that would allow Ms. Hebert to perform the essential functions of her job. [*Id.* at ¶¶ 70-72]. The weekly testing suggested by Ms. Hebert as an alternative to the vaccine could leave infection completely undetected for as long as six days, and an infected person could spread COVID-19 for as long as

4

48 hours before their condition would register as a positive in a test. [*Id.* at ¶ 70]. While non-pharmaceutical methods such as masking and social distancing existed to reduce the risk of COVID-19, vaccination was believed to be the most effective defense against the disease. [*Id.* at ¶¶ 63, 71]. Given Ms. Hebert's responsibilities required her to be in regular in-person contact with WDC residents and DDS staff, as well as the public, it was also determined that her role would be incompatible with her working exclusively from home. [*Id.* at ¶ 71].

### B. Procedural History

Ms. Hebert filed a charge with the United States Equal Opportunity Commission ("EEOC"). [Doc. No. 1 at ¶ 5]. On September 15, 2022, the EEOC issued a right-to-sue notice in response. [*Id.*].

On May 10, 2023, Ms. Hebert filed a Complaint against DDS and EOHHS alleging religious discrimination in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). [*Id.* at ¶¶ 78-89]. On October 16, 2024, Defendants moved for summary judgment on substantive grounds. [Doc. No. 21]. On November 3, 2024, Ms. Hebert filed three separate Motions to Strike, challenging declarations filed by Defendants in support of their Motion for Summary Judgment. [Doc. Nos. 24-26]. Preliminarily, I address the motions to strike before I turn to the motion for summary judgment.

## II.    PLAINTIFF'S MOTIONS TO STRIKE

### A. Motion to Strike Declaration of Lawrence Madoff, MD

Ms. Hebert seeks to strike the Declaration of Lawrence Madoff, MD, filed in support of Defendants' Motion for Summary Judgment, on the grounds that: (1) Dr. Madoff is not qualified to provide testimony concerning the efficacy of the COVID-19 vaccines; (2) Dr. Madoff's testimony is not based on sufficient facts or data; (3) Dr. Madoff's testimony is not based on

reliable principles and methods; and (4) Dr. Madoff's opinion does not reflect a reliable application of the principles and methods to the facts of the case. [Doc. No. 24 at 1]. These efforts to strike Dr. Madoff's testimony fail, as they have already in many similar matters before this Court. *See, e.g.*, *Haley v. Exec. Off. of Health & Hum. Servs.*, No. 23-cv-11691-RGS, 2024 WL 1836480, at *1 n.1 (D. Mass. Apr. 26, 2024); *Howe v. Mass. Dep't of Corr.*, No. 22-cv-40119-MRG, 2024 WL 3536830, at *7 n.11 (D. Mass. Jul. 25, 2024); *Macauda v. Dep't of Child. & Fams.*, No. 22-cv-30124-LTS, slip op. at 2-3 (D. Mass. Jul. 30, 2024); *Delaney v. Mass. Dep't of Revenue*, No. 23-cv-10136-LTS, slip op. at 2-3 (D. Mass. Jul. 31, 2024); *Buchanan v. Mass. Dep't of Corr.*, No. 23-cv-10192-FDS, 2024 WL 4203239, at *1 (D. Mass. Sept. 16, 2024); *Andrade, Jr. v. Mass. Dep't of Corr.*, No. 22-cv-11899-FDS, 2024 WL 4267673, at *1 (D. Mass. Sept. 23, 2024).

To begin, Dr. Madoff's knowledge, skill, experience and training qualify him as an expert capable of offering an opinion about the efficacy of vaccines. *See Da Silva v. Am. Brands, Inc.*, 845 F.2d 356, 361 (1st Cir. 1988) (holding that a "court should consider all relevant qualifications when ruling on the admissibility of expert testimony"); *see also Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006) (explaining that "Rule 702 has been interpreted liberally in favor of the admission of expert testimony"). Dr. Madoff is licensed to practice medicine in Massachusetts, is board certified in internal medicine and infectious diseases, and serves as the Medical Director of the Massachusetts Department of Public Health's Bureau of Infectious Disease and Laboratory Sciences ("Bureau"). [Doc. No. 23-1 at ¶¶ 1-2]. In this role, he "provide[s] clinical medical leadership, epidemiologic input to the State Epidemiologist, and consultation to other departments and programs within the Department, local health departments, and other agencies," in addition to "clinical supervision and medical guidance in disease

recognition, investigation and control, as well as interpretation and application of policies and procedures." [*Id.* at ¶ 2]. The Bureau's Immunization Division was primarily responsible "for coordination with the Centers for Disease Control and Prevention ('CDC') on vaccines including COVID-19 vaccines." [*Id.* at ¶ 5]. Such experiences qualify Dr. Madoff as an expert in this scenario.

Ms. Hebert's attacks on the bases for Dr. Madoff's testimony and opinions additionally fail. Ms. Hebert complains that Dr. Madoff did not conduct "any primary research into the efficacy of the COVID-19 vaccines," [Doc. No. 24 at 2], but this reflects an overly stringent reading of Rule 702, as "[a]n expert is not required to rely only on his own primary research in forming an opinion." *Buchanan*, 2024 WL 4203239, at *1 (quoting *Macauda*, No. 22-cv-30124-LTS, slip op. at 2)*; see also Crowe v. Marchand*, 506 F.3d 13, 16-18 (1st Cir. 2007) (finding expert's testimony on standard of care in treating plaintiff's injury admissible even though expert had not inspected relevant imaging himself). Requiring Dr. Madoff to conduct primary research in this instance would also cut against Rule 703 which allows experts to rely on materials produced by others so long as such materials are "of a type reasonably relied upon by experts in the particular field." *Crowe*, 506 F.3d at 18 ("[T]he drafters of the rule explicitly contemplated that experts in the medical field would routinely rely on reports from other medical professionals."). Here, in forming his opinions about the vaccine's efficacy, Dr. Madoff relied on professional medical studies concerning the topic, satisfying Rule 703. [Doc. No. 23-1 at ¶¶ 19, 22, 25, 26 n.4-8].

Ms. Hebert also criticizes Dr. Madoff's interpretation of the underlying studies, claiming that Dr. Madoff failed to take into account new vaccination figures published by the Massachusetts Department of Health, the potential for undercounting in infection numbers, the

limitations of certain studies, as well as newer studies allegedly pointing to weaknesses in the vaccine's efficacy. [Doc. No. 24 at 2-6]. However, concerns about interpretive quality are "properly attributed to the weight of Dr. Madoff's testimony rather than its admissibility." *Buchanan*, 2024 WL 4203239, at *1 (quoting *Macauda*, No. 22-cv-30124-LTS, slip op. at 2). And Dr. Madoff's refusal during his deposition to provide definitive numbers to multiple hypothetical questions regarding a vaccinated individual's absolute risk reduction and the waning effectiveness of the vaccine does not indicate a lack of sufficient knowledge or factual support, nor does it demonstrate the use of unreliable principles and methods. As Dr. Madoff communicates at multiple points throughout his deposition, such numbers can only be discerned at the population level and are dependent on the particular context of specific studies. [Doc. No. 24-1 at 28-30]. His hesitancy reflects "a measured approach to the science" rather than "a lack of subject-matter expertise." *Buchanan*, 2024 WL 4203239, at *1.

Accordingly, Ms. Hebert's Motion to Strike the Declaration of Dr. Madoff is DENIED.

B. **Motions to Strike Portions of Declarations of Marylou Sudders and Richard J. O'Meara**

Ms. Hebert next seeks to strike portions of the Declarations of Marylou Sudders, the then-Secretary of EOHHS, and Richard J. O'Meara, DDS's Regional Director for the Southeast Region, regarding the efficacy of the COVID-19 vaccines. Ms. Hebert argues that Ms. Sudders and Mr. O'Meara are not competent to testify on the matter, such that their statements about efficacy constitute hearsay. This argument also fails.

Mr. O'Meara's statements merely provide the context behind DDS's decision to deny Ms. Hebert's requested religious exemption. Defendants use his testimony to establish DDS's understanding of the costs to DDS's operations that Ms. Hebert's requested exemption would have had on the department at the time. *See, e.g.*, [Doc. No. 23 at ¶¶ 48, 50-53]. Such concerns

8

about adverse impacts animated DDS's decision to deny Ms. Hebert's request. As DDS's Regional Director, Mr. O'Meara is competent to testify based on his personal knowledge of DDS's decision-making processes, and his statements do not constitute inadmissible hearsay. *See Anastos v. Boston Medical Center*, No. 22-cv-11971, slip op. at 7 (D. Mass. Jan. 7, 2025) ("[S]tatements 'offered only for context', rather than for the truth of the matter asserted, are not hearsay under Federal Rule of Evidence 801(c)." (citing *United States v. Catano,* 65 F.3d 219, 225 (1st Cir. 1995))); *see also Rodrique v. Hearst Commc'ns, Inc.*, No. 24-cv-1289, 2025 WL 227489, at *6 (1st Cir. Jan. 17, 2025) (holding that a witness did not proffer inadmissible opinion testimony when recounting her company's conclusions regarding vaccine efficacy, based on her personal experience, involvement, and knowledge).

As to Ms. Sudders's Declaration, Defendants likewise assert that her testimony reflects "her own personal knowledge of the executive department's responsibility, and the basis for its response, during the pandemic to protect—through vaccination—the patients, clients, residents and communities it serves." [Doc. No. 30 at 2]. As the Secretary of EOHHS, she was "responsible for overseeing all public health, health care, welfare and human services operations, policies and programs provided by subordinate agencies within [EOHHS]." [Doc. No. 23-3 at ¶ 1]. Ms. Sudders also served as the director of the Commonwealth's COVID Command Center, in which role she acted as the Governor's principal advisor regarding the Commonwealth's response to the pandemic and was directly involved in developing the COVID-19 vaccination requirements relied upon by EO 595. [*Id.*]. Ms. Sudders may therefore testify, based on her personal knowledge and experience, regarding the administration's and EOHHS's understanding of the vaccine, the vaccine's efficacy, and their related actions. However, Defendants also rely upon Ms. Sudders's non-expert statements at times to support direct assertions of vaccine

9

efficacy. *See, e.g.*, [Doc. No. 23 at ¶¶ 31, 42]. Such a use is impermissible. I will consider Ms. Sudders's Declaration only to the extent that it is used to establish the understanding of the administration and EOHHS at the time.

As such, Ms. Hebert's Motion to Strike the Declaration of Ms. Sudders and Motion to Strike the Declaration of Mr. O'Meara are <u>DENIED</u>.

### III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A. <u>Legal Standard</u>

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont de Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252).

B. <u>Analysis</u>

Title VII declares it an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). The First Circuit applies a two-part framework in analyzing religious discrimination claims under Title VII. "First, [a] plaintiff must make her prima facie case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004); *see also Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023). Second, once the plaintiff establishes a prima facie case, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Cloutier*, 390 F.3d at 133.

Here, it is not necessary for me to decide whether Ms. Hebert has made her prima face case because, regardless of whether she has, I find that Defendants have met their burden to articulate an undue hardship in granting Ms. Hebert's accommodation.

Because Defendants did not offer a reasonable accommodation, they must prove that any accommodation for Ms. Hebert would have resulted in an undue hardship. *Lowe*, 68 F.4th at 719. Under Title VII, an undue hardship is established when "it would impose more than a de minimis cost on the employer" and "[the] burden is substantial in the overall context of an employer's business." *Cloutier*, 390 F.3d at 134 (emphasis omitted); *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). In conducting an undue hardship analysis, the court should consider "the context of the particular employer's business, the nature of operations, direct economic costs, and indirect costs such as health or safety." *Taylor v. Milford Reg'l Med. Ctr., Inc.*, 733 F. Supp. 3d 8, 17 (D. Mass. 2024). The key question is whether the employer can "show that the burden of granting an

11

accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470.

Here, a reasonable jury could not find, based on the undisputed material facts, that Defendants, with the information available at the time, could have reasonably accommodated Ms. Hebert's request for an exemption without suffering "substantial increased costs." As discussed, in the fall of 2021, Ms. Hebert worked for a DDS-operated residential care facility, WDC, providing care to approximately 175 developmentally impaired adults. [Doc. No. 23 at ¶¶ 39, 59]. DDS was struggling with significant staffing shortages and service disruptions resulting from COVID-19 exposure and infections among staff and residents. [*Id.* at ¶¶ 43-47]. Absences due to COVID-19 required DDS to temporarily shut down programs, combine programs, use forced overtime, and use temporary employees due to staffing shortages. [*Id.* at ¶ 46]. At WDC alone, there existed approximately 100+ open positions, and several employees were out of work on medical leave. [*Id.* at ¶ 47]. Meanwhile, Ms. Hebert's role at WDC required her to be in regular in-person contact with residents and other DDS staff at the facility. [*Id.* at ¶ 61]. Her responsibilities included assisting residents with personal and nutritional care, as well as other daily living activities such as cleaning and hygiene. [*Id.* at ¶ 60]. She also attended individual review meetings for residents and helped implement habilitative, behavioral, and recreational programs. [*Id.*]. Although Ms. Hebert requested that she be able to work exclusively from home, such an accommodation would have been unreasonable given that a main component of her job was providing in-person care at WDC. *See Buchanan v. Mass. Dep't of Corr.*, No. 23-cv-10192-FDS, 2024 WL 5202787, at *4 (determining that, had plaintiff requested to work remotely, such an accommodation would be unreasonable because "she could not have reasonably performed her job duties from afar"); *see also id.* at *3 (also finding "the requested accommodation of

12

masking and testing without vaccination would not adequately protect the people [plaintiff] encountered" in her employment). Given Ms. Hebert's in-person responsibilities, "[a]llowing her to remain unvaccinated would have increased the risk of spreading COVID-19 throughout the hospital and beyond," impeding Defendants' ability to maintain their operations and provide a safe environment for their staff and patients. *Harmon v. Bos. Med. Ctr.*, No. 22-cv-11856-MJJ, 2024 WL 4815292, at *5 (D. Mass. Nov. 18, 2024); *see also Antredu v. Mass. Dep't of Youth Servs.*, 729 F. Supp. 3d 76, 84 (D. Mass. 2024) (finding undue hardship as to vaccination exemption request where plaintiff's proximity to patients and staff would have created higher risk of COVID-19 transmission); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest."). Defendants have thus demonstrated that permitting Ms. Hebert to work while unvaccinated would have resulted in "substantial increased costs" amounting to an undue hardship.

Ms. Hebert argues that Defendants have not established undue hardship because there exists a material dispute as to whether the COVID-19 vaccines protected against COVID-19 infection and transmission. But there exists no such dispute. In addition to relying on their own experience during the pandemic, Defendants relied on the opinions of public health authorities and medical researchers in concluding that vaccination was the best way to prevent COVID-19 infection and transmission. *See Rodrique*, 2025 WL 227489, at *4 (when "the record demonstrates that [an employer] relied on the objective, scientific information available to [it], with particular attention to the views of public health authorities," a court will find that the employer "acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees"). EO 595, upon which Defendants created their vaccination policy, sets forth the Commonwealth's findings that the COVID-19 vaccines

were effective, safe, and necessary to mitigate the virus's harmful effects. [Doc. No. 23-2 at 1 ("[V]accination is the most effective tool for combating the 2019 novel Coronavirus," and "COVID-19 vaccines are safe and effective, as evidenced by the fact that COVID-19 vaccines have satisfied the U.S. Food and Drug Administration's rigorous scientific standards for safety, effectiveness, and manufacturing quality.")]. The contemporaneous research similarly concluded that, while no vaccine is 100% effective, the COVID-19 vaccines were "highly effective at reducing the burden of infection with all known variants of SARS-CoV-2, and even more effective at reducing the risk of serious illness and death." [Doc. No. 23-1 at ¶ 19].[1] As the First Circuit has held, "COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected," and "[v]accination also reduces a person's risk of transmitting COVID-19 to others." *Doe v. Mills*, 16 F.4th 20, 32–33 (1st Cir. 2021).

Ms. Hebert fails to point to any credible evidence demonstrating that COVID-19 vaccines are ineffective. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record."); *see also Rodrique*, 2025 WL 227489, at *6 ("[Plaintiff's] undue hardship argument fails because no medical evidence in the summary judgment record contradicts [Defendant's] conclusion that vaccinated people are less likely to infect others."). Although Ms. Hebert points to a 2023 study and a 2023 FDA letter that she alleges reflect doubt about the effectiveness of the vaccines,

---

[1] As Defendants request, [Doc. No. 22 at 18], I take judicial notice of the scientific data and articles cited in Dr. Madoff's Declaration concluding that COVID-19 vaccines are effective in preventing infection and transmission of the virus. *See Melino v. Bos. Med. Ctr.*, No. 22-cv-12119-RGS, 2024 WL 2724145, at *1 n.2 (D. Mass. May 28, 2024), *aff'd*, No. 24-cv-1527, 2025 WL 325873 (1st Cir. Jan. 29, 2025) (taking judicial notice of CDC's recommendations regarding vaccination against COVID-19, as well as "the medical and statistical information upon which they rest"); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905) ("While we do not decide and cannot decide that vaccination is a preventive of smallpox, we take judicial notice of the fact that this is the common belief of the people of the State.").

[Doc. No. 28 at 7, 12-13], these materials are irrelevant given that they were published well after the time in question here. *See Anastos*, No. 22-cv-11971, slip op. at 11 (holding that COVID-19-related facts must be viewed from the time relevant to the exemption request). Ms. Hebert also alleges that the FDA did not approve the vaccines for prevention of infection or transmission of the virus, relying on a May 2021 letter from the FDA, wherein FDA's Chief Scientist, Denise M. Hinton, wrote to Pfizer that:

> Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine *may be effective* in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks.

[Doc. No. 28-1 at 4 (emphasis added)]; *see* [Doc. No. 28 at 6]. However, "[w]hile it uses somewhat cautious language, this excerpt supports the view that the COVID-19 vaccine may be effective in preventing COVID-19; it does not say or imply that the vaccine is ineffective." *Mariano v. Bos. Med. Ctr.*, No. 22-cv-11930-JEK, 2025 WL 269239, at *7 (D. Mass. Jan. 22, 2025).

Finally, Ms. Hebert contends that a genuine dispute exists as to vaccine efficacy because of deficiencies in Dr. Madoff's testimony. She largely repeats arguments made in her motion to strike, which I have addressed and will not repeat here. Suffice it to say that Dr. Madoff's testimony would not leave a reasonable juror in doubt about the efficacy of the COVID-19 vaccines. *See supra* Part II.A at 5-8; *see also Buchanan*, 2024 WL 5202787, at *5-6 (rejecting similar arguments as to Dr. Madoff's testimony).

In sum, the undisputed facts show that allowing Ms. Hebert to continue working while unvaccinated would have jeopardized Defendants' workplace operations, as well as the health of other staff and patients. No reasonable jury could therefore conclude that Defendants could have

15

accommodated Ms. Hebert's request for an exemption from their vaccination policy without undue hardship.

## IV. CONCLUSION

For the above reasons, Plaintiff's Motions to Strike [Doc. Nos. 24-26] are <u>DENIED</u> and Defendants' Motion for Summary Judgment [Doc. No. 21] is <u>GRANTED</u>.

SO ORDERED.

/s/ Myong J. Joun<br>
United States District Judge